# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>1046 W 26th Ave., Apartment 315, Anchorage, Alaska, and the person of ANTOINE DAVIS, aka "Tone" and "Shorty." | Case No. 3:18-mj-00493-DMS<br><br>**UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Leonard Torres, a detective with the Anchorage Police Department (APD) and a deputized Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI), having been duly sworn, do hereby swear and affirm the following facts as being true to the best of my knowledge, information and belief:

## INTRODUCTION

1.      I make this affidavit in support of application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant to search 1046 W 26th Ave., Apartment 315, Anchorage, Alaska (hereinafter "SUBJECT PREMISES"), and the person of ANTOINE DAVIS, aka "Tone" and "Shorty" (hereinafter "SUBJECT"). The facts contained in this affidavit are based on my own personal knowledge, as well as information provided to me by other law enforcement officers. The information contained in this affidavit is

submitted for the purpose of supplying probable cause for the issuance of a search warrant for 1046 W 26th Ave., Apartment 315, Anchorage, Alaska, and the person of ANTOINE DAVIS, aka "Tone" and "Shorty," and therefore, does not contain all the facts known to me relating to this investigation. I have set forth the facts that I believe establish probable cause that evidence of a crime, contraband, fruits of crime, or other items illegally possessed, or property designed for use, intended for use, or used in committing crimes of drug trafficking, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to commit drug trafficking, in violation of 21 U.S.C. § 846, are located at the SUBJECT PREMISES and on the SUBJECT.

*Affiant Background*

2.      I have been an APD police officer since June 2000 and an APD detective since January 2004. My duties and responsibilities included conducting overt and covert narcotic investigations (state and federal), sex trafficking investigations of adults and minors (state and federal), sex and physical abuse investigations of minors (state), infanticide/homicide investigations (state), overt and covert cybercrime investigations pertaining to child pornography, online child enticement and sextortion (state and federal), executing and serving state/federal warrants and subpoenas, making arrests, and investigating violations of municipal, state and federal law. In January 2018 I was assigned to the FBI Violent Crimes Against

Children (VCAC) task force which focuses on sex and labor human trafficking investigations victimizing both adults and minors, and undercover online chats relating to child enticement, sextortion and child pornography investigations. As both a detective and a TFO I have participated in a wide array of criminal investigations, including human trafficking, and violent crimes and drug-related cases.

3.      I have received training in the investigation of sex and labor trafficking, drug trafficking, and the smuggling and transportation of illegal narcotics, among other things. Additionally, I am a crisis negotiator, a law enforcement polygrapher, and an APD academy instructor.

## METHOD OF OPERATION OF SEX AND DRUG TRAFFICKERS

4.      Based upon my training, experience and participation in this and other drug and sex trafficking investigations, and based upon my conversations with other experienced law enforcement agents and officers, with whom I work, I know the following:

a. In my experience, I have found that the trafficking of persons as well as the distribution of controlled substances is frequently a continuing activity over months and years.  I have also found the activities used by individuals involved in sex trafficking and drug trafficking are similar in terms of how they operate, conceal proceeds, and move the product which is either drugs or women and

Page 3 of 38

girls. Persons involved in the trafficking of illegal controlled substances typically will obtain and distribute controlled substances on a regular basis, much as a distributor of a legal commodity would purchase stock for sale. Similarly, such drug traffickers will maintain an "inventory" which will fluctuate in size depending upon the demand for and the available supply of the product. It has been my experience that drug traffickers keep records of their illegal activities not only during the period of their drug trafficking violations but also for a period of time extending beyond the time during which the trafficker actually possesses/controls illegal controlled substances. The records are kept in order to maintain contact with criminal associates for future transactions and so that the trafficker can have records of prior transactions for which the trafficker might still be owed money or might owe someone else money.

b. I know that in *United States v. Terry*, 911 F.2d 272 (9th Cir. 1990), *United States v. Angulo-Lopez*, 791 F.2d 1394,1399 (9th Cir.1986), *United States v. Hernandez-Escargega*, 886 F. 2d 1560, 1567 (9th Cir. 1989) and in *United States v. Fannin*, 817 F. 2d 1379, 1381-1382 (9th Cir. 1987), the court held that in the case of drug traffickers, evidence is likely to be found where dealers live and a

search warrant may be properly issued against a suspected drug dealer's residence despite the lack of direct evidence of criminal activity at the residence. The court also held in *United States v. Cardoza*, 769 F. 2d 625, 630 (9th Cir. 1985) that a search warrant may be properly issued to search a drug trafficker's storage locker despite lack of direct evidence linking the storage locker to criminal activity. My experience investigating drug crimes is consistent with the holdings of these cases in that I have participated in multiple investigations in which the search of a drug traffickers residence and storage locations have located controlled substances and other evidence, fruits, and contraband related to the trafficking of drugs.

c. It is common for members of drug trafficking organizations to maintain records evidencing their illegal activities including books, ledgers, receipts, notes and other papers relating to the transportation, ordering, possession sale and distribution of drugs and the collection and transportation of drug proceeds. I also know that the aforementioned books, records and ledgers etc., are frequently maintained in the drug trafficker's residence and sometimes in the traffickers' vehicle(s). Further, I know that these documents are often retained long after the transactions to which

they refer have taken place. The same information holds true for members of human trafficking organizations. They also maintain records evidencing their illegal activities including books, ledgers, receipts, notes and other papers relating to the transportation, ordering, possession and sale of women and girls for the purpose of selling sex. I also know that the aforementioned books, records and ledgers etc., are frequently maintained in the drug trafficker's residence and sometimes in the traffickers' vehicle(s). Further, I know that these documents are often retained long after the transactions to which they refer have taken place.

d. It is common for members of drug trafficking and sex trafficking organizations to conceal in their residences and businesses in strong boxes, safes, lock boxes, concealed compartments and hidden rooms, large quantities of United States currency, foreign currency, financial instruments, precious metals, jewelry, and other items of value which are proceeds from drug and sex trafficking.

e. I know that evidence of excessive wealth when there are no other outward indications to support such conspicuous displays of wealth can be probative evidence of crimes involving greed, to include the distribution of controlled substances and sex trafficking. Therefore, receipts showing the expenditure of large sums of money and/or the

expensive assets themselves can be in some circumstances evidence of drug trafficking. I also know that drug traffickers commonly keep the expensive assets themselves, along with documentation of the purchases in or about their residences, and sometimes documentation of these assets in their vehicles or businesses.

f. It is common for members of drug trafficking and sex trafficking organizations to utilize wire transfer companies, (i.e. Western Union, MoneyGram, Paypal) to facilitate the movement of currency throughout the trafficking organization's area of operations. I know that members of trafficking organizations will utilize nominee senders to disguise the origination of the funds and to break up the amount being sent by any one person. I know that the actual owner of the currency will commonly provide the nominee sender with hand-written information concerning the intended recipient's name, intended pay-out location and amounts of money to be sent. I also know that, in an attempt to keep track of the proceeds, it is common for the drug and sex traffickers and/or nominee senders to maintain copies of the wire transfer receipts, amounts sent and tracking numbers. I also know that the aforementioned items are frequently maintained in the drug and sex trafficker's residence, businesses, and vehicles.

g. It is increasingly common for members of drug trafficking and sex trafficking organizations to utilize direct cash deposits into a co-conspirator's bank accounts to facilitate the movement of currency throughout the trafficking organization's area of operations. I know that members of drug trafficking organizations will utilize nominee depositors to disguise the origination of the funds and to break up the amount being deposited by any one person. I know that the actual owner of the currency will commonly provide the nominee depositor with hand-written information concerning the intended recipient's name and account number and amounts of money to be deposited. I also know that, in an attempt to keep track of the proceeds, it is common for the drug and sex traffickers and/or nominee depositors to maintain copies of the deposit slips. I also know that the aforementioned items are frequently maintained in the drug and sex trafficker's and/or nominee depositor's residence, businesses, or vehicles.

h. It is common for members of drug trafficking organizations to utilize express parcel delivery companies, (i.e. Federal Express, United Parcel Service, DHL, and U.S. Postal Service Express Mail) to facilitate the movement of controlled substances and currency throughout the trafficking organization's area of operations. I also

know that, in an attempt to keep track of the packages and their contents, it is common for the trafficker to maintain copies of the shipping receipts and tracking numbers. I know that members of drug trafficking organizations will utilize nominee senders/recipients to disguise the origination and destination of the packages. I know that the actual owner of the drugs/currency will commonly provide the nominee sender with information concerning the intended recipient's name and address; this information may be hand-written, or may be communicated through text message or other digital means. I also know that the aforementioned items are frequently maintained in the drug trafficker's residence, businesses, hotel rooms, and vehicles.

i.  It is common for members of drug trafficking and sex trafficking organizations to utilize fraudulent identification, in order to purchase airline tickets and travel, send wire transfers, rent residences and storage facilities, and subscribe for telephone/cellular telephone service. I also know that it is common for drug and sex traffickers to keep fraudulent identification nearby and easily accessible to facilitate their flight upon the discovery of their illegal activities by law enforcement. I also know that the

aforementioned items are frequently maintained in the drug
trafficker's residence, businesses, or vehicles.

j. It is common for drug trafficking organizations involved in the
purchase, dilution, and repackaging of controlled substances for
distribution to maintain equipment and supplies (i.e. scales,
baggies, cutting agents) on hand over a lengthy period of time, even
when they do not have any controlled substances on hand. I also
know that the aforementioned items are frequently maintained in
the drug traffickers' residence, business, or other storage locations.
I have also found scales and packaging materials in traffickers'
vehicles.

k. It is common for members of drug trafficking organizations to
attempt to recruit couriers to transport drugs or currency
throughout the trafficking organization's area of operations. I know
that often times the courier's handler will provide the courier with
hand-written notes regarding travel itinerary, hotel information
and contact telephone numbers prior to the courier departing on the
trip to transport drugs or money. I also know that often times the
organizations will pay a flat rate (i.e. $2,000 per kilogram of
cocaine) plus expenses for the couriers. Therefore, often times the
couriers will keep handwritten itemized lists of expenses and/or

Page 10 of 38

receipts, in order to be reimbursed. I also know that the aforementioned items are frequently maintained in the courier's residence, or in the residences and vehicles of members of the drug trafficking organization.

l. It is common for members of drug trafficking and sex trafficking organizations to take or cause to be taken, photographs and/or videos of themselves, their co-conspirators and associates, and victims. It is also common for members of drug and sex trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and/or their co-conspirators with controlled substances, large sums of money, guns and expensive assets (i.e. jewelry, luxury cars). I also know that the aforementioned items are frequently maintained in the drug trafficker's residence or business. In some instances, photographs of an individual's illegal activities, or other evidence, fruits, and contraband, may be included in text messages, social media postings, or other forms of digital or online communications. These instances of digital documentation can be for the purpose of establishing and individual's bona fides within their respective community, for the purpose of recruiting women and girls to engage in sex trafficking, or may simply be an expression of an individual's ego.

m. It is common for members of drug trafficking and sex trafficking organizations to possess scanners, security cameras and computers (with Internet access) to protect and conceal their operation from law enforcement and other criminals and to monitor surveillance activities of law enforcement. Members of drug and trafficking organizations often store records related to drug and sex trafficking and money laundering activities using computer equipment. In addition, computers and peripheral devices, such as wireless routers and cable modems, may contain evidence of drug and sex trafficking. For example, I know that drug traffickers commonly check the delivery status of parcels containing drugs and/or money by entering tracking numbers into parcel company or post office websites. These inquiries are captured by these websites, which identify the Internet Protocol (IP) address that performed the inquiry. The IP address can be linked to both a subscriber of internet service, as well as to a Media Access Control (MAC) address, which identifies the piece of computer hardware through which the internet was accessed while making the inquiry. A MAC address is a unique identifier assigned to every piece of hardware that connects to the Internet. In my experience, computers and peripheral devices such as wireless routers and cable modems are

commonly maintained for long periods of time at the user's residence. As it concerns sex trafficking, computers and other digital devices are commonly used to post online advertisements announcing women and girls who are available for sex. These advertisements are frequently checked and updated to ensure they remain on display on the website where they are posted. Digital devices can also be used to communicate with customers about illegal sexual activity, either through email, direct message services, or text message.

n. I know that people involved in trafficking controlled substances frequently carry and possess firearms to protect themselves. Drug trafficking can be a cash business, and drug traffickers are often the targeted by other criminals for robbery because those involved in illegal drug trafficking rarely report thefts or robberies of their drugs and money to the police. Therefore, they carry firearms to protect themselves, their drugs, and their proceeds. Also, lower level drug traffickers tend to be more at risk than higher-level traffickers. It is more likely that lower-level traffickers deal with strangers and drug addicts. Thus, lower-level narcotics trafficking can be more dangerous than dealing at the wholesale level, where there is already an established business relationship with larger

customers. Lower level traffickers can be territorial, and can get into disputes with rival traffickers over customers and "turf." Finally, the customers of lower level traffickers are frequently addicts, who gather money to pay for their drugs through other crimes, primarily theft-related crimes. Because firearms are valuable to narcotics traffickers, customers with stolen firearms often trade them to traffickers in exchange for narcotics.

o. It is common for members of drug trafficking and sex trafficking organizations, in an attempt to disguise their identities and illegal activities, to use pre-paid cellular telephones and pre-paid long distance calling cards. I know that often times the only way to connect a subject with a particular pre-paid cellular telephone or calling card is to seize the phone or calling card from the trafficker or his residence. I also know that the aforementioned items are frequently maintained in the drug and sex trafficker's residence, business, or vehicles.

p. Cellular telephones and other digital devices – to include computers and tablets - are an essential tool used by drug and sex traffickers. Regarding cellular telephones in particular, I know that drug traffickers will use cellular telephones to facilitate their activities because of the mobility offered by cellular telephones. Further,

drug traffickers are attracted to cellular telephones because they enable suspects to avoid the risks attendant with operating from a fixed location. Digital devices afford spontaneous access to drug and sex customers and to drug sources, as well as to potential victims of sex traffickers. Further, I know that cell phones and other digital devices used by drug and sex traffickers frequently contain data stored within which includes the telephone numbers, names, and/or aliases of drug and sex customers and drug sources, as well as victims of sex trafficking. This data can also include digital versions of each of the records described above, such as financial records, records of money transfers, records of transportation, and records of shipments. Finally, as explained above, I know that in addition to names and numbers, cell phones used by drug and sex traffickers commonly contain images and recordings of people involved in trafficking, images of firearms used in these activities, images of controlled substances, images of drug and sex trafficking proceeds, and digital data related to the online posting of sex trafficking advertisements. I also know that these photographs and other digital data may be often retained long after the images are captured. In some instances, this data can also be maintained on a digital device long after the item has been deleted.

q. It is common for members of a drug trafficking and sex trafficking organization to attempt to legitimize their profits from the distribution of drugs. To accomplish these goals, drug and sex traffickers utilize foreign and domestic banks and the bank's attendant services to include cashier's checks, safe deposit boxes, and money drafts. Drug and sex traffickers may also utilize the purchase/sale of real estate and vehicles to legitimize their profits. I also know that the records of the aforementioned transactions are frequently maintained in the drug trafficker's residence, business, hotel rooms, or vehicles.

r. It is common for members of drug trafficking organizations to utilize businesses, both real and fictitious, to conceal both the distribution of drugs as well as to conceal the source of their illegal income. It is common for drug traffickers to possess business licenses and articles of incorporation for these businesses, even if the businesses exist only on paper. I also know that these records and documents are frequently maintained in the drug trafficker's residence, hotel rooms, or business.

s. I have become familiar with the practice of some drug traffickers in the use of express parcel shipping services as a method of transporting illegal drugs into Alaska. Using this method, a drug

Page 16 of 38

trafficker will acquire drugs from a source state. The drugs will then be placed in a parcel, and arrangements will be made for shipment to Alaska via express shipping services such as FedEx, UPS, DHL, and the United States Postal Service. Traffickers will commonly provide fictitious information for the sender's name, address, and telephone number. Likewise, traffickers will commonly provide a fictitious name for the recipient, but will use a genuine receiving address to ensure delivery. The use of a nominee's address is common for receipt of the parcel, as many traffickers are reluctant to receive parcels at their own addresses. Some traffickers are willing to be present at the receiving address when the parcel arrives. Other traffickers will avoid the receiving address until after delivery of the parcel, and others will instead direct a nominee to transport the parcel to second or subsequent locations. Additionally, traffickers will sometimes hi-jack an address, shipping a parcel to an address known to be vacant, or whose occupant's schedule is known to the trafficker, arranging delivery at a time when the occupant is expected to be absent. I am also familiar with the practice of some traffickers to pay nominees to obtain mailboxes to which parcels will be shipped. Based on my training and experience, I know that the locations where parcels

containing controlled substances and/or drug proceeds are shipped to commonly hold evidence of drug trafficking.

t.  I know that drug traffickers commonly use nominees to conduct transactions which would otherwise require the trafficker to be identified, such as purchases and rentals of vehicles, residences, hotel rooms, and sometimes cell phones.

u.  I know that Arizona and California are source states, that is, a state from which controlled substances are commonly shipped to Alaska, and likewise, a state to which drug proceeds are commonly shipped.

v.  Based on my experience, narcotics trafficking operates in a pyramid-like structure, with the largest wholesale traffickers at the top of the pyramid, and the traffickers who deal directly with customers at the bottom. There are several levels of traffickers in the middle. As you travel down each level of trafficker, the drugs can be diluted, or "stepped on," to increase their volume, and therefore profit. At the bottom level, drugs are sold to individual users who are often drug addicts.

w.  I know that people involved in the use, possession, manufacture, importation, and/or trafficking of controlled substances  and sex

Page 18 of 38

trafficking commonly engage in these activities at all hours of the day and night.

x.  I know that sex trafficking and trafficking controlled substances is a cash business, and frequently very lucrative. Also based on my training and experience, I know that people involved in the possession, manufacture, importation, and/or trafficking of controlled substances commonly possess money generated by these activities, and further that these people commonly possess stolen property accepted in exchanges for controlled substances. Further, based on my training and experience, I know that people involved in the possession, manufacture, and/or distribution of controlled substances commonly maintain and possess firearms to protect themselves, their controlled substances, and their trafficking proceeds. Further, I know that the above described documents, money, stolen property, and firearms are commonly found in the vehicles and residences of drug traffickers, as well as in other places maintained for the trafficking of controlled substances, as well as lower profile locations sometimes referred to as "stash houses."

y.  Individuals who, through enticement, intimidation, or force, enlist individuals to engage in sex trafficking, and who profit from the

prostitution of others are called "pimps." Pimps, as well as, prostitutes who are not "managed" have embraced the internet as a means of advertising services and communicating with customers. Certain web sites have been created to facilitate communications between prostitutes and their clients. The pimps at times use physical force and/or fear to control their prostitutes. They control the prostitutes' actions, and collect monies earned through acts of prostitution. The pimps facilitate the prostitution by transporting the prostitutes to locations where the prostitution occurs. The pimps, at times, transport prostitutes across state lines for the purpose of prostitution. The pimps sell drugs as another means to make money. Pimps also provide drugs to girls they manage for multiple reasons, including as a means of controlling the girls through their dependency on the drugs provided by the pimp, as well as being a way to assist the girls with the demands of prostituting for long periods of time. Prostitutes utilize cellular telephones as a way to be contacted by clients. These phone numbers are included in the advertisements that are posted on various prostitution assisting web sites. Contact is made through phone calls as well as text messages. Pimps and their prostitutes communicate with each other through cellular phones regarding

Page 20 of 38

prostitution activity. Communication is made through phone calls as well as text messages. Pimps and prostitutes communicate with others involved in the prostitution/pimp sub-culture either by voice calls or text messages regarding prostitution/pimp activities. Pimps and their prostitutes use cellular telephone cameras to take photographs of the prostitutes used in the prostitution advertisements. Pimps and their prostitutes use cellular telephones to transmit photographs to email accounts and/or prostitution assisted internet sites.

## BACKGROUND OF THE INVESTIGATION

5.      Your affiant, along with other state and federal law enforcement officers, have been involved in a drug and human trafficking investigation into an individual identified as ANTOINE DAVIS, aka "Tone" and "Shorty."

*Recruitment of CHS and Identification of "Shorty" as a Drug Dealer*

6.      On August 20, 2018, while meeting with an FBI confidential human source (CHS)[1], FBI Anchorage Special Agent (SA) Jessica Hais and the affiant were provided information on an individual in Anchorage working as both a pimp and drug dealer with the street name "Shorty or Tone." Specifically, the CHS noted the following:

---

[1] CHS does not have any known pending charges. CHS' criminal history includes seven theft related-charges, violation of conditions of release, and failure to carry proof of insurance.

a. The CHS was approached in August 2018 by "Shorty" while walking on 26th street near Spenard Road in Anchorage. Shorty invited the CHS up to his apartment. The CHS described Shorty as an approximately 55-year-old, short black male in casual clothing, with hair graying on top, and a small amount of facial hair. At the time of the initial meeting, the CHS did not recall Shorty's specific address but stated if you turned right onto 26th St. from Spenard Road, it was the 2nd or 3rd apartment building down. The CHS also indicated that there was a sign out front of the building saying "for lease." The CHS described where in the building Shorty's apartment was located. The CHS did not meet any of Shorty's associates, but quickly realized based on things Shorty told her that he was a pimp and a drug dealer. Shorty had a large supply of crack cocaine and heroin in the apartment and offered heroin to the CHS. The CHS also noted Shorty was on his cell phone often while th eCHS was in his apartment. Shorty gave the CHS his cell number which was 951-743-0165. The CHS stated that Shorty had told her he had an iPhone.

b. During this first meeting, Shorty asked the CHS to work for him as a prostitute. Shorty told the CHS that he doesn't have his girls

walk the track [in Spenard].[2] The CHS was unsure if that meant his business was largely online or if his girls walked in other areas of Anchorage. Based on statements Shorty made, the CHS was led to believe Shorty has a group of women (likely 4-5) in Anchorage that he is keeping them at another apartment or house; however, Shorty did not disclosed this location.

c. The CHS has had numerous meetings with Shorty subsequent to that initial contact in August 2018. During these subsequent meetings, Shorty attempted to recruit the CHS to work for him as a prostitute and was nice to the CHS during this time. For example, Shorty offered the CHS approximately $200 worth of heroin each time the CHS has gone to see him; Shorty has given these drugs to the CHS without requiring the CHS to pay for them. The CHS uses heroin and has used the drugs that Shorty has given to her.

d. The CHS also noted that Shorty has asked the CHS to travel with him and his women. Shorty told the CHS that he often travels with his girls to pimp them out. Shorty stated he is going to Arizona with the girls in the upcoming weeks. Shorty told the CHS he will pay

---

[2] "Track" is a slang term in the sex trafficking industry used to describe a fixed location or section of road where women and girls work soliciting customers.

Case 3:18-mj-00493-DMS   Document 1-1   Filed 10/04/18   Page 23 of 39

for a plane ticket and all other costs if the CHS will travel with him to Arizona.

    e.   During these trips to Shorty's apartment, the CHS has seen the following drugs in large quantities in the apartment: Percocet, Xanax, Lorazepam, morphine, heroin, methamphetamines and cocaine (both crack and powder forms). The CHS noted there were exceptionally large amounts of crack cocaine in Shorty's apartment. The CHS has never seen Shorty take any drugs and believed he sells them. The CHS also noted that, when CHS has spent long periods of time in Shorty's apartment, there have been constant visitors that have stopped in to buy drugs from him.

    f.   The CHS also saw multiple handguns in Shorty's apartment.

    7.      In a recent meeting, Shorty told the CHS that the CHS could work [as a prostitute] out of an apartment Shorty is acquiring on the first floor of the apartment building in which he resides. The CHS is unsure if Shorty has rented another apartment. The CHS noted Shorty gives drugs to the building landlord in exchange for the landlord keeping quiet about Shorty's business. The CHS stated this has enabled Shorty to have control over the apartment building. The CHS believes Shorty currently holds another property in town, and believes this is where he keeps the girls who work for him. Shorty referred to these girls as "my ho's." Shorty showed the

Page 24 of 38

CHS pictures of two of these girls. The CHS describes both as in their mid 20's, but without more pictures and context, the CHS could not confirm they were adults.

8.    On September 27, 2018, the CHS was able to show the affiant the apartment that Shorty resides in and it was confirmed to 1046 W 26th Ave., Apartment 315.  The CHS also stated that an unknown black adult female was residing in the apartment with Shorty and the CHS believed that Shorty transported to female to Alaska from California.

9.    On October 3, 2018, the CHS was shown a photograph of Antoine Davis.  The CHS identified him as the individual the CHS knew as Shorty.

*Other Individuals Who Identify Shorty as a Drug Dealer*

10.    The Anchorage FBI is also familiar with the SUBJECT from other drug-related cases.  During an interview with agents from the FBI Anchorage Safe Streets Task Force (SSTF), an individual indicted in an unrelated drug-trafficking case confirmed after being shown a photograph of Antoine Davis that he was also known as "Shorty."  This individual also stated the SUBJECT travels back and forth to California frequently.  This individual provided this information as part of a proffer session.  No promises were made to the indvidual regarding the individual's current federal case or any other cases in which the individual might be implicated.

Page 25 of 38

11.    Similarly, in an interview with Cooperating Witness 1 (hereinafter "CW1") by FBI Anchorage SSTF agents, CW1 identified Shorty as her main drug supplier. CW1 described him as a black male who is from the Compton (Los Angeles) area of California. At the time CW1 was buying drugs from Shorty, he resided in an apartment at 1117 Chugach Way in Anchorage, Alaska. CW1 said Shorty travels back and forth to California and brings up both methamphetamine and heroin. CW1 said she has put money in bank accounts and used Wal-Mart to wire money to Shorty when he is in California. CW1 said Shorty got the drugs to Alaska via commercial airline and shipping parcels.

12.    CW1 stated she had purchased as much as two pounds of methamphetamine from Shorty at a time and she would pay $3500 a pound. CW1 said she could also go direct to his apartment and get ounces or whatever she needed from him. CW1 said there were times where he would have drugs left over and would give them to her to sell while he was gone. CW1 said Shorty's real name was Antoine Davis.

13.    Your Affiant is aware of a search warrant having been executed at CW1's residence for evidence related to drug trafficking. To date, no charges have been filed in that case. A review of CW1's criminal history shows no pending charges. CW1 has not been promised any benefit in exchange for her information.

Page 26 of 38

*Information about ANTOINE DAVIS's Background*

14.    The CHS stated that Davis's schedule is fairly regular. Davis spends the weekdays (Sunday through Thursday) in California. Davis did not tell CHS specifically where he lives, but mentioned he has property in both Northern and Southern California.  He told CHS he has a live-in girlfriend in California. He also told CHS he flies from California to Alaska every Thursday or Friday, and stays in Alaska all weekend.  Davis told CHS he has been out of jail for two years.  He stated that he was in jail in California for 11 years prior to that time.  CHS does not know what his charges were, but noted that many people in Alaska know Davis, and most of them seem afraid of him.

15.    Antoine Davis' criminal history includes the following from California: eight drug-related convictions to include possession, manufacturing, and distribution of controlled substances, as well as being a felon in possession of a firearm.  Davis also has a non-extraditable arrest warrant for being a felon in possession of a firearm from Nevada. The warrant was issued on August 2, 2017.

*Controlled Buy on October 4, 2018*

16.    On October 4, 2018, law enforcement coordinated with the CHS to arrange for the purchase of controlled substances from the SUBJECT at the SUBJECT LOCATION.  The CHS placed a call from her personal phone

to the SUBJECT. This call was monitored and recorded by law enforcement. During this call, the CHS negotiated for the purchase of methamphetamine and heroin. The CHS asked what she could purchase for $1500 (within this price was $80 that the CHS owed to the SUBJECT).

17.     Your Affiant drove the CHS to the SUBJECT LOCATION. She exited the vehicle and was observed by multiple law enforcement officers entering the apartment complex containing the SUBJECT LOCATION.

18.     After the CHS entered the SUBJECT LOCATION, she explained what drugs she wanted and who they were for. SUBJECT received a phone call shortly thereafter on his cell phone from an individual seeking to purchase drugs from the SUBJECT. At the direction of the SUBJECT, the CHS left the apartment in order to meet the third party who had called and let them into the apartment complex. By the time the CHS met the third party, he was already in the complex, but not yet in the SUBJECT LOCATION. The CHS and the third party returned together to the apartment. The CHS saw the SUBJECT sell $120 worth of methamphetamine to the third party. When the third party left the apartment, the SUBJECT pulled out a Manilla envelope from the coffee table in the apartment and proceeded to weigh out methamphetamine on a scale that was on the coffee table. The amount that was weighed out was not enough methamphetamine for the amount of money that the CHS had, so the

Page 28 of 38

SUBJECT retrieved an additional quantity of methamphetamine from a shopping bag hidden inside of a console located in a couch in the living room. In a later debrief with the CHS, she described that the plastic bag containing methamphetamine contained a significant quantity of drugs even after the additional amount being purchased by the CHS had been taken out.

19.     The SUBJECT also retrieved from the console a sandwich bag containing heroin and weighed that out on the scale.  The SUBJECT told the CHS that business was good because of the recently-issued Permanent Fund Dividend (PFD), and that he only had $1100 worth of heroin left in his supply.

20.     In total, the CHS purchased 56.8 grams of methamphetamine and .06 grams of heroin from the SUBJECT for $1420 (with an additional $80 used to pay off an existing drug debt between the CHS and SUBJECT). These drugs field-tested positive for methamphetamine and heroin, respectively.

21.     At the end of the transaction, the CHS left the apartment and returned to your Affiant's vehicle.  She was driven to a secure location were she gave law enforcement her purse; law enforcement retrieved the methamphetamine and heroin from her purse.  She was searched and no additional contraband was located.

22.     The CHS was wearing a recording device that captured audio, and also allowed for real-time monitoring by law enforcement.

*Summary of Probable Cause*

23.     I submit that there is sufficient probable cause to believe that evidence, fruits, and instrumentalities of drug trafficking, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to commit drug trafficking, in violation of 21 U.S.C. § 846, are present at the SUBJECT LOCATION and on the person of ANTOINE DAVIS, aka "Tone" and "Shorty." I make this conclusion based on the information contained above, which includes:

a.  On numerous occasions from August 2018 to present, the CHS has observed methamphetamine, heroin, cocaine, and other controlled substances in the SUBJECT RESIDENCE in quantities consistent with drug distribution amounts. During this time, the SUBJECT has provided heroin to the CHS.

b.  The CHS has observed activity by the SUBJECT consistent with drug distribution, to include frequent visitors to the SUBJECT PREMISES while the SUBJECT has been present, as well as use by the SUBJECT of his phone in a way that is consistent with drug trafficking.

c.   On October 4, 2018, the CHS purchased 56.8 grams of methamphetamine and .06 grams of heroin from the SUBJECT for

Page 30 of 38

$1420 (with an additional $80 used to pay off an existing drug debt between the CHS and SUBJECT). This transaction occurred at the SUBJECT LOCATION. During this purchase, the CHS observed an additional quantity of methamphetamine at the SUBJECT LOCATION.

## DIGITAL DEVICES AT THE SEARCH LOCATION

*Unlocking Device(s) with Biometric Features*

24.    In this case, CHS has identified that the SUBJECT is in possession of an Apple iPhone. As noted above, cell phones can be a critical component in any drug trafficker's operation, allowing the trafficker to maintain contact with suppliers and purchasers, and maintain records of transactions. Modern cell phones such as an iPhone also allow drug traffickers to connect to the Internet to access drug-related records that may be stored online, such as flights, postal and shipment records, and bank records. Your Affiant is aware that cell phones are often kept on an individual's person, or in a bag or satchel that the person might have on their possession. In light of this fact, the United States is seeking authorization to search the person of ANTIONE DAVIS, aka "Tone" and "Shorty." Your Affiant is seeking authorization to seize this device because of its likely connection to drug trafficking.

Page 31 of 38

25.     As to any cell phones or other digital devices whose seizure is authorized by this search warrant, The warrant would also permit law enforcement to compel the SUBJECT to unlock this Apple iPhone and any other digital devices under his custody and control subject to seizure pursuant to this warrant using the device's biometric features. I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, to include newer Apple iPhones, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that

can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d. If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device with his or her irises.

Page 33 of 38

For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

f. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be

found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

g. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device

Page 35 of 38

equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the SUBJECT PREMISES and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

26.     Due to the foregoing, if law enforcement personnel encounter a device that is subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of the device(s), to the fingerprint scanner of the device(s) found at the premises; (2) hold the device(s) found at the premises in front of the face to those same individuals and activate the facial recognition feature; and/or (3) hold the device(s) found at the premises in front of the face of those same individuals and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

## **REQUEST FOR SEALING**

27.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary given that this investigation remains covert at this time. Premature disclosure of this search warrant and its supporting documentation could allow for the potential flight of subjects and the potential destruction of evidence. Furthermore, disclosure may place

Page 37 of 38

executing officers at risk. A motion to seal and draft order accompany my warrant application.

## **CONCLUSION**

28.     I have set forth the facts that I believe establish probable cause that evidence of a crime, contraband, fruits of crime, or other items illegally possessed, or property designed for use, intended for use, or used in committing crimes of drug trafficking, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to commit drug trafficking, in violation of 21 U.S.C. § 846.

//

//

//

//

//

//

//

//

//

//

//

//

//

Page 38 of 38

29.    I respectfully request that the Court issue a warrant authorizing the FBI and its authorized representatives, including but not limited to other law enforcement agents assisting in the above-described investigation, to search 1046 W 26th Ave., Apartment 315, Anchorage, Alaska, and the person of ANTOINE DAVIS, aka "Tone" and "Shorty," within 14 calendar days of the issuance of the requested warrant.

Signature Redacted

LEONARD TORRES
Anchorage Police Department
Task Force Officer, FBI

Subscribed and sworn to before me
this 4th day of October, 2018

Signature Redacted

SCOTT A. ORAVEC
U.S. Magistrate Judge
District of Alaska
Anchorage, Alaska